District Court for the United States of America
Southern Florida

Jose Cartagena
Scott Blattman
Claimants

v.

INDEPENDENT NATIONAL MORTGAGE CORP.
INDYMAC MORTGAGE HOLDINGS, INC.,
INDYMAC BANCORP,
INDYMAC FEDERAL BANK FSB,
IMB MANAGEMENT HOLDINGS,
ONEWEST BANK, FSB,
ONEWEST BANK GROUP,LLC,
INTERMEDIATE HOLDCO,
IMB HOLDCO,
STEPHEN T. MNUCHIN,
GREENBERG TRAURIG, P.A.,
CORY W. EICHHORN,
MICHELE STOCKER,
M. DEPASQUALE,
FLORIDA DEFAULT LAW GROUP, PL,
ECHEVARIA CODILIS & STAWIARSKI,
JONATHAN W. MASKER,
ANNE M. CRUZ-ALVAREZ,
LISA CULLARO,
ROGER D. STOTTS,
FEDERAL DEPOSIT INSURANCE CORPORATION
JOHN DOES 1-1000, JANE DOES 1-1000 ROES 1-
1000
    Respondents/Defendants.

CASE No.: 0:14-CV-60866-WJZ

Claimants' (Plaintiffs') Submission
of Florida Court Complaint
including 3 Exhibits.

**Exhibit 1:**
Paladin mortgage loan analysis and
foreclosure audit;

**Exhibit 2:**
Expert Witness Affidavit of Patrick
F. Williams stating defendant has no
standing to foreclose;

**Exhibit 3:** Title of Real
Estate (Warranty deed);

FILED BY _____ D.C.

2014 MAY 23 PM 1:45

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA-FTL

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL DISTRICT
IN AND FOR BROWARD COUNTY, FLORIDA
CIVIL ACTION

| | |
|---|---|
| Jose Cartagena,<br>Scott Blattman,<br>Does 1-100,<br>    Claimants,<br><br>vs.<br><br>INDEPENDENT NATIONAL<br>MORTGAGE CORPORATION,<br>INDYMAC MORTGAGE HOLDINGS,<br>INC., INDYMAC BANCORP,<br>INDYMAC FEDERAL BANK FSB,<br>IMB MANAGEMENT HOLDINGS,<br>ONEWEST BANK FSB,<br>ONEWEST BANK GROUP LLC,<br>INTERMEDIATE HOLDCO,<br>IMB HOLDCO,<br>STEPHEN T. MNUCHIN,<br>GREENBERG TRAURIG P.A.,<br>CORY W. EICHHORN,<br>MICHELLE STOCKER,<br>M. DEPASQUALE,<br>FLORIDA DEFAULT LAW GROUP PL,<br>ECHEVARIA CODILIS & STAWIARSKI<br>JONATHAN W. MASKER,<br>ANNE M. CRUZ-ALVAREZ,<br>LISA CULLARO,<br>ROGER D. STOTTS,<br>FEDERAL DEPOSIT INSURANCE<br>CORPORATION;<br>DOES 1-1000, Inclusive.<br>    Defendants. | Claim No. CACE 13-014054(25)<br>Division 11.<br><br>**Trial by Jury Demand.**<br>**Demand for Affirmative Relief.**<br>**Requirement for Stay on Sale of Property**<br><br>Jose Cartagena and Scott Blattman,<br>Amended Complaint:<br><br>Entity seeking foreclosure has commenced a<br>wrongful foreclosure suit:<br>    No Standing to Sue; No Capacity to Sue;<br>    Not a Proper Party; No Agency<br>    Lost Note Affidavit Invalid,<br>    Entity Suing Does Not Exist,<br>    Failure to properly record assignments,<br>    An unknown non-disclosed party is suing to<br>    foreclose,<br>    Frivolously and Inappropriately Plead<br>    Complaint; Usury;<br>Breach of Contract:<br>    Loan,<br>    Currency Exchange; Unjust Enrichment;<br>Identity Theft,<br>Invalid/Inappropriate Lost Mortgage Note Bond,<br>Deceptive and Unfair Practices (15 U.S.C. 1692<br>and Florida Consumer Collection Practices Act);<br>Predatory Lending;<br>Violatons of RESPA, TILA, HOEPA, Fair<br>Lending Practices, Act, Fair Credit Reporting<br>Act; Constructive Fraudulent<br>Misrepresentations & RICO;<br>Set Aside Trustee's Sale; Unfair Debt Collection<br>Practices; Slander of Title;<br>Etc., Etc., Etc. |

# TABLE  OF  CONTENTS

I.      **Parties**................................................................................................................1

II.     **Venue and  Jurisdiction**...................................................................................1

III.    **Statement of  Facts**.........................................................................................2

IV.    **Nature of  Action**...........................................................................................3

V.     **Significance of REMIC**.................................................................................20

VI.    **Any Case: Payment in Nature of a Guarantee, Such as Payments to The REMIC**........22

VII.   **Claims for Relief**...........................................................................................29

        Count 1:  Homeownership Equity Protection Act.............................................29

        Count 2:  Violations of RESPA.........................................................................32

        Count 3:  Violations of TILA............................................................................32

        Count 4:  Violations of Fair Credit Reporting Act...........................................33

        Count 5:  Constructive Fraudulent Misrepresentation.....................................34

        Count 6:  Breach of Fiduciary Duty..................................................................35

        Count 7:  Unjust Enrichment............................................................................35

        Count 8:  Constructive Civil Conspiracy..........................................................36

        Count 9:  Constructive Civil RICO...................................................................37

        Count 10:  Set Aside Notice of Trustee Sale/Lis Pendens................................40

        Count 11:  Quiet Title.......................................................................................40

        Count 12:  Wrongful Foreclosure.....................................................................42

        Count 13:  Usury...............................................................................................42

        Count 14:  Predatory Lending - Florida Fair Lending Act - 494-0078............43

        Count 15:  Unfair Debt Collection Practices.....................................................44

        Count 16:  Slander of Title.................................................................................44

VIII.  **Relief**................................................................................................................45

IX.    **Demand for Trial by Jury**..............................................................................47

X.     **First Verification by Jose Cartagena**............................................................47

XI.    **Notary's Jurat: Jose Cartagena**....................................................................48

XII.   **Second Verification by Scott Blattman**.........................................................48

XIII.  **Notary's Jurat: Scott Blattman**....................................................................49

XIV.  **Exhibits**

        Paladin Mortgage Loan Analysis and Foreclosure Audit ............................Exhibit 1

        Affidavit of Expert Witness Patrick F. Williams............................Exhibit 2

        Sales Contract.................................................................Exhibit 3

        Title of Real Estate (Warranty Deed) ...............................Exhibit 4

# TABLE OF AUTHORITIES

**United States**

8 U.S.C. §1101(a)(21)...................................................................................1

12 C.F.R. §226.17.......................................................................................26
12 C.F.R. §266.4(a).....................................................................................25
12 C.F.R. §266.18.......................................................................................25
12 C.F.R. §266.18(c)(1)(iii).........................................................................24
12 C.F.R. §266.18(d)...................................................................................24
12 C.F.R. §226.23(b)...................................................................................26
12 C.F.R. §2601......................................................................................32,44
24 C.F.R. §3500.6.......................................................................................24
24 C.F.R. §3500.7.......................................................................................23
12 U.S.C. §2607......................................................................................25,32
15 U.S.C. §806 (A through G)......................................................................20
15 U.S.C. §1601...........................................................................................32
15 U.S.C. §1602(f) and Regulation Z §226.2(a)(17)....................................26
15 U.S.C. §1602(u)......................................................................................26
15 U.S.C. §1635.......................................................................................27,30
15 U.S.C. §1635(a) and (b).........................................................................27
15 U.S.C. §1639......................................................................................29,30

15 U.S.C. §1639(a)(l)..................................................................................24

15 U.S.C. §1639(h)......................................................................................28

15 U.S.C. §1681(o)......................................................................................33

15 U.S.C. §1681(n)(a)(2).............................................................................33

15 U.S.C. §1692...........................................................................................44

18 U.S.C. §1961...........................................................................................38

26 U.S.C. §806(a)(1)....................................................................................21

26 U.S.C. §860(F)(a)(2)(B)..........................................................................21

28 U.S.C. §1741(1)..................................................................................47,48

Uniform Commercial Code (U.S.), 3-104......................................................6

Uniform Commercial Code (U.S.), 3-302(3) and (4)......................................6

Uniform Commercial Code (U.S.), 3-307......................................................6

Uniform Commercial Code, §673.3011.......................................................13

Uniform Commercial Code, §673.3021.......................................................13

Domestic Mail Manual, 122.32.....................................................................2

Reg. §1.8-6G-2(j)(1)...................................................................................22

**Florida Statutes**

    Title XXIX §668.60 through 668.610............................................................................2

    Title XXVIII §655.005(t)............................................................................37

    Fair Lending Act, 494.00792(1)(a)............................................................30

    Title XXXIII............................................................................37,38,43

    Title XXXIII, section 494.0067 and 494.000611............................................37,38

    Title XXXIII, section 537.007............................................................37,43

    Title XXXIII, section 494.0066............................................................37,38

    Title XXXIII, section 494.0067............................................................37

    Title XXXIX, sections 673.3011 and 673.3021............................................13

**Cases**

    *Merscorp, Inc. v Romaine,* 8 NY3d 90............................................................6

    *Saratoga County of Chamber of Commerce v. Pataki,* 100 NY2d 801............................8

    *Curtis v. Moore,* 152 NY 159, 162 [1897]............................................................8

    *Flyer v. Sullivan,* 284 AD 697, 699 [l" Dept 1954])............................................8

    *Bankers Trust Co. v. Hoovis,* 263 AD2d 937, 938 [3d Dept 1991]............................8

    *LaSalle Bank National Association v. Ahearn,* 59 AD3d 911 [3d Dept 2009]............8

    *Wells Fargo Bank, N.A. v. Marchione,* 887 NYS 2d 615 [2nd Dept 2009]............8

    *Glynn* v. *United Steel Works Corp.,* 160 Misc. 405............................................9

    *Bunker Ramo Corp. v United Business Forms, Inc.,* 713 F2d 1272 (1983, CA7 Ill)............38

    *National Organization for Women, Inc. v. Scheidler,* 510 U.S. 249,
        114 S. Ct. 798, 127 L. Ed. 2d 99 (1994)............................................38

    *Morosani v. First Nat'l. Bank,* 581 F. Supp 945 (1984, ND Ga),
        summary judgment den. 581 F. Supp 955............................................39

    *M & P Concrete Prods. v. Woods,* 590 So. 2d 429 (1991)............................................45

**Authorities**

    The Handbook of Mortgage-backed Securities, FJ Fabozzi, McGraw-Hill Prof............10

    Mortgage-backed Securities, Leme, Lins and Picard, Thompson-West 2013 Ed............10

# I.  PARTIES

1.  Jose Cartagena and Scott Blattman ("Claimants") take up housekeeping in Broward county florida.

2.  Claimants are over the age of eighteen years, of sound mind, and competent to state facts, and will testify if called upon to do so.

3.  Claimants state the following based upon research, information or belief, and if based upon belief, believe said statements to be true.

4.  Claimants represent themselves, in this matter.

5.  Claimants, at all times herein mentioned, Claimants was/were, and now is/are State nationals identified at 8 U.S.C. 1101(a)(21).

6.  Defending parties are: INDEPENDENT NATIONAL MORTGAGE CORPORATION ("INDYMAC BANK FSB"), 4000 Executive Parkway 400, San Ramon, CA 94583, a.k.a. INDYMAC BANK FSB, P.O. Box 2971, Phoenix AZ 85062, a.k.a. INDYMAC BANK FSB a.k.a  901 East 104th Street, Bldg B #400/500, Kansas City MO 64131,  a.k.a INDYMAC BANK FSB, 155 North Lake Avenue, Pasadena CA 91101, a.k.a. INDYMAC BANK FSB, P.O. Box 78826, Phoenix AZ 85062, a.k.a.  INDYMAC FEDERAL BANK FSB;  ONEWEST BANK FSB,  Pasadena, CA;  GREENBERG TRAURIG P.A., CORY W. EICHHORN, MICHELLE STOCKER,  M. DEPASQUALE, FLORIDA DEFAULT LAW GROUP PL,  d.b.a.  ECHEVARIA CODILIS & STAWIARSKI, P.O. Box 25018, Tampa FL 33622; JONATHAN W. MASKER,  IMB HoldCo LLC, 888 East Walnut Street Pasadena, California 91101 dba INTERMEDIATE HOLDCO, 888 East Walnut Street, Pasadena, California 91101;  ONEWEST BANK GROUP LLC, Pasadena, California;  Stephen T. Mnuchin,  and DOES 1-1000 inclusive.

# II.  VENUE & JURISDICTION

7.  Venue in this district is proper in that one of the parties takes up housekeeping, and the defendants transact business here and the conduct complained of  (mostly) occurred here.

8.  Claimants, for reasons unknown, were told by the (bank) representative, that all finance documents were produced with the name Winny Stainer and instructed they were to be signed as such, even though plaintiff has no proof of that name for the notary.

9.  Claimants  jose cartagena and scott blattman's  valid Drivers' License and U.S. Passport all indicate the names JOSE CARTAGENA and SCOTT BLATTMAN.

10.  All prior property recordings in Broward county were in the names of Jose Cartagena or Scott Blattman. Claimants challenged the use of JOSE CARTAGENA and SCOTT BLATTMAN but under threat from INDYMAC'S loan officer/employees that no loan would be made, but said challenges were to no avail. Therefore, for purposes of this claim, the claimants intends to use their legal names of jose cartagena and scott blattman and NOT the imposed name of JOSE CARTAGENA, and SCOTT BLATTMAN, as used in the loan documents constructed by INDYMAC.

11.  Claimants, for similar reasons unknown, at the time of settlement (close of escrow), United Republic Title LLP's representative, also wrongly listed in the Note and Mortgage the name JOSE CARTAGENA and JOSELITO L. CARTAGENA, which Claimant objected to, but was for naught.

12.  Claimants, on research, information and belief, thereon allege there is suspicion by claimants that INDYMAC and all defendants have performed some sort of identity theft in connection with obtaining credit scores or other data:  Violation of Title XXIX, Sections 668.60-668.610.

13.  Jurisdiction of the subject matter in this Court is proper because the cause of action herein arose in Orange County, California by virtue of a mortgage loan and related inter-temporal transactions associated therewith which concern the Claimants' primary residential real estate which is located at 2208 NW 8th Terrace, Wilton Manors, Florida (zip code exempt: Domestic Mail Manual 122.32), which is located in Broward county which is within this Judicial District.

11.  Venue of this action is proper within this Court as the Claimants and at least one of named Defendants is subject to suit within this Court, as the Defendants do business in Broward county and in the State of Florida, and thus all Defendants are properly sued in this Court.

## III.  STATEMENT  OF  FACTS

12.  On information and belief, Claimants allege that Defendant OneWest Bank is a principal subsidiary of Holdco Inc. 101 Columbia Road, Morris town, New Jersey, who according to the California Secretary of State, merged out, but is registered in Delaware as a company (#3841131, #2003232, #2957926, #3315361), corporation and limited liability companies with the address, 2711 Centerville Road 400, Wilmington, DE (19808), ;   Intermediate HoldCo, is a Delaware Limited Liability Company, whose agents address is 160 Green Tree Drive 101, Dover, Delaware 19904,  is who formed INDYMAC

FEDERAL BANK FSB who was a nationally charted bank, regulated by the Office of Thrift Management. HoldCo and Intermediate Holdco are companies incorporated in the jurisdictional state of Delaware, doing business in the state of California and Florida, whose addresses in California remain unknown; Claimants are not sure if any of the Defendants addresses and similarly, have no information as to any agents in Florida, for service of process. Claimants will seek this information in discovery.

13.  On research, information and belief, Claimants thereon allege that the Defendants HoldCo and Intermediate HoldCO and each of them, and its wholly owned subsidiary, OneWest Bank Corp., was and is a California Corporation, and the subsidiaries of HoldCo and Intermediate HoldCo, with its principal place of business in the State of Delaware. At all times mentioned herein, Defendants and each of them, claims to be the mortgage lender.  Defendants addresses and similarly, have no information as to any agents in Florida, for service of process. Claimants will seek this information in discovery.

14.  Claimants on research, information and belief thereon allege that, at all times herein mentioned, each of defendants sued herein was the agent, employee, assignee, predecessor or successor in interest of each of the other remaining defendants, and that each of the defendants were, at all times, acting within the purpose and scope of such agency and/or employment.

## IV. NATURE OF THE ACTION

15. Claimants, on research, information and belief, thereon allege that this case arises out of Defendants' egregious and ongoing and far reaching fraudulent schemes for improper use of Claimants identity, fraud in the inducement, fraud in the execution, usury, and breaches of contractual and fiduciary obligations as Mortgagee or "Trustee" on the Deed of Trust, "Mortgage Brokers," "Loan Originators," "Loan Seller," "Mortgage Aggregator," "Trustee of Pooled Assets," "Trustee or officers of Structured Investment Vehicle," "Investment Banker," "Trustee of Special Purpose Vehicle/Issuer of Certificates of 'Asset-Backed Certificates," "Seller of 'Asset-Backed' Certificates (shares or bonds)," "Special Servicer," and "Trustee," respectively, of certain mortgage loans pooled together in a trust fund. The

participants in the securitization scheme described herein have devised business plans to reap millions of dollars in profits at the expense of Claimants and other investors in certain trust funds.

16.  In addition to seeking compensatory, consequential and other damages, Claimants seek declaratory relief as to what, (if any) party, entity or individual or group thereof is the owner of the special deposited promissory note executed at the time of the loan closing, and whether the Deed of Trust (Mortgage) secures any obligation of the Claimants, and further seek a Mandatory Injunction requiring re-conveyance of the subject property to the Claimants or, in the alternative a Final Judgment granting Claimants Quiet Title in the subject property.

17. Claimants, on research, information and belief, thereon allege that on December 28, 2007 Claimants were lead to believe that they were entering into a loan agreement with Defendants and each of them, for the sum $586,350.00.

18.  Claimants, on research, information and belief, thereon allege that INDYMAC BANK FSB did not give a loan to Claimant Jose Cartagena on December 28, 2007, as described in item 1 of the Note, which states: "In return for a loan that I have received, I promise to pay U.S. $586,350.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is INDYMAC BANK, F.S.B., A FEDERALLY CHARTERED SAVINGS BANK."

19.   Claimants, on research, information and belief, thereon allege that INDYMAC BANK FSB ("IndyMac") never did give a loan to Claimant as described in the note; and performed some type of breach of contract, or performed a bate and switch tactic, making Claimant Cartagena responsible, for some other type of obligation that was the IndyMac's fiduciary duty to perform.

20.  Claimants, on research, information and belief, thereon allege that immediately after closing the mortgage loan, Claimants were instructed by INDYMAC BANK FSB to make all payments on the loan numbered 128598527, to INDYMAC BANK, F.S.B., P.O. Box 78826, PHOENIX, AZ 85062-8826, starting February 1, 2008 (Note, ¶ 3, page 1).

21.  Claimants, on research, information and belief, thereon allege that Defendants and each of them, are business entities that have initiated an illegal judicial foreclosure sale proceeding under an alleged power of sale to foreclose contained in an alleged note, allegedly secured against the property located 2208 NW 8th Terrace, Wilton Manors, Florida, (hereinafter "the subject property").

22. Claimants, on research, information and belief, thereupon allege that said allegedly special deposited promissory note was never executed by Claimants, or if it was executed, has long since been lost or intentionally destroyed, or paid in full, assigned to unknown third parties, or sold by way of "Security Package," such that Defendants and each of them, lacks or lacks standing to initiate a foreclosure proceeding against the subject property.

23.  Claimants are the owners of the legal title (allodial in nature) under a Mexican Land Grant and United States Land Patent which number is currently unidentified as of this writing, and the fee simple of the real estate identified as 2208 NW 8th Terrace, Wilton Manors, Florida.  Claimants reserve the right to amend this portion upon discovery of the patent and land grant.

24.  Claimants, on research, information and belief, thereon allege Defendants and each of them, are not and was not the holder in due course of the note, payment of which was secured by the security instrument, nor is it or was it in possession of the note properly endorsed to it, nor was it the holder in due course of the note when it initiated foreclosure proceedings, nor was it or is it otherwise entitled by law in this State to initiate foreclosure under the security instrument. See Exhibit 1 and  2.

25.  Claimants, on research, information and belief, thereon allege Defendants and each of them has had no right to initiate foreclosure under the security instrument, nor did they have the right to direct the Trustee to foreclose and sell the subject property owned by Claimants.  Defendants and each of them, knew or reasonably should have known that they had no right to foreclose the security instrument unless and until they actually have in their possession the original note properly endorsed to it or assigned to

it as of the date preceding the notice of default recorded by the Trustee named in the security instrument. See Exhibit 2 (Affidavit of Patrick F. Williams.)

26.  On December 28, 2007, Cartagena signed a note with IndyMac Bank, F.S.B., promising to pay IndyMac $586,350.00, and to secure the note signed a mortgage which stated: IndyMac is the lender; that Mortgage Electronic Registration Systems, Inc. ("MERS") is the "mortgagee of record" for purposes of recording the Cartagena mortgage; that MERS "is a separate corporation that is acting solely as nominee for Lender and Lender's successors and assigns'; and, that "MERS (as nominee for Lender and Lender's successors and assigns) has the right: (A) to exercise any or all those rights, including, but not limited to, the right to foreclose ..." While mortgage assignments are traditionally publicly recorded with the County Clerk, under the MERS system, the Cartagena Note and Nortgage could instead be transferred electronically to any entity participating in the MERS system and tracked electronically only by MERS *(see, Merscorp, Inc. v Romaine,* 8 NY3d 90). On December 11, 2008: MERS assigned the subject mortgage to INDYMAC FEDERAL BANK, stating the assignment was effective as of December 22nd 2009.  See Exhibit 1 (Paladin Mortgage Loan Analysis and Foreclosure Audit) and Exhibit. 2.  Affidavit of Patrick F. Williams (¶ 5).

27. On March 19,2009, OneWest purchased IndyMac from the Office of Thrift Supervision/Federal Deposit Insurance Corporation ("FDIC") was Conservator of IndyMac (Exhibit 2, ¶ 5E).  As of this date OneWest Bank has not provided any type of power of attorney designating the attorneys in fact authorized to execute on behalf of FDIC all "endorsement of promissory notes or alloges to promissory notes".  As a negotiable note secured by a note (see, U.C.C. 3-104), in order to perfect a valid assignment of the entire instrument, the Cartagena note must be indorsed on the instrument itself or an attached paper *(see,* U.C.C. 3-302 [3], [4]).  Cartagena has placed the assignment of the note and mortgage, and thus the effectiveness of the indorsement on the note, in issue. To the extent OneWest claims the rights of a holder in due course of the note, it has the burden of showing the authority of the indorsement on the note and to establish that it is a holder in due course of the note *(see,* U.C.C. 3-307). The only item offered by OneWest

Bank, or their attorney is a Lost Note Bond in the amount of $526.85: Said note does not name either Claimant as the beneficiary, nor does it name Florida or the Court as trustee/fiduciary. Since there is no evidence of a note, only a Lost Note Affidavit, and inadequate bond (number S-719994 dated May 1, 2009) coverage, said bond does not cover the entire amount in controversy which is approximately 586,350.00, plus interest, penalties, etc. There is no bonafide proof of a transfer of the Note and Mortgage (Deed of Trust) from the original lender and holder of the note and mortgage to OneWest Bank or to the Attorneys who prosecuted a foreclosure in Florida, who are Defendants sued herein. Claimants demand that Defendants increase the bond amount from $526.85, which is undervalued, and increase the value to a nominal amount of $586,350.00, but prefer the court order Defendants to obtain a supplemental bond to be issued for the note at maturity (30 years) the penal  sum  (in controversy) $1,512,360.00; And, if Defendants fail, Claimants demand similar relief given in the Florida Eleventh Circuit case *"HSBC BANK USA, et al. vs. Orlando Eslava, et al,"* case number: 1-2008-CA-055313. The Court ordered HSBC Bank to file a bond to insure the replacement note: HSBC failed to perform to the Court's order, and homeowner won the case, getting clear title, expungement of lis pendens, and the note and deed of trust voided.

28. Upon research, information and belief, Claimants believe and thereon allege that the signatures of Erica A. Johnson Seck and Eric Friedman were signed by the same person: As Erica A. Johnson Sech signature on the Affidavit for a Lost or Misplaced Original Note is different than the signature on the Assignment of Mortgage. See Exhibit 1 [*Paladin Associates Mortgage Loan Analysis and Foreclosure Audit for Jose Cartagena, Summary and Conclusion* (¶ 3, page 7)]; and,  Exhibit  2  [*Affidavit of Patrick F. Williams, dated November 12, 2013*: Conclusions, ¶ 7, page 4], which are made reference hereto as though set forth fully, and are annexed hereto as **Exhibits 1 and 2**, respectively.

29. Claimants, upon research, information and  belief, thereon allege that the bond itself contains no signature or mark of the principal and therefore is invalid/inadequate on its face and seeks an order of the court to increase the amount to at least the value of the note, at maturity.

30. Claimants, upon research, information and belief, thereon allege OneWest, nor any of its attorneys have submitted proof in evidentiary form that establishes that IndyMac held the note at the time of its receivership, or that the FDIC sold, assigned or transferred the note and mortgage to OneWest prior to the commencement of the foreclosure proceeding.

31. In the absence of evidentiary proof that the FDIC transferred the note to OneWest (i.e., indorsement of the note by the FDIC), the gap in time between when OneWest acquired ownership of IndyMac assets (March 19, 2009) and when the December 11, 2008 MERS assignments states the actual assignment took effect (December 22, 2008), supports one conclusion, namely the note and mortgage remained within the MERS system and was only assigned by the written MERS assignment.

32. Claimants, on research, information and belief, thereon allege Absent standing, OneWest may not seek judicial relief (*Saratoga County of Chamber of Commerce v. Pataki*, 100 NY2d 801). As OneWest is not the original mortgagee or lender of the Cartagena note and mortgage, to have standing to commence the foreclosure action it must prove that the assignment of the note and mortgage was completed prior to the commencement of the action. An assignment of the note and mortgage may be effected by delivery alone, or by a writing (see, *Curtis v. Moore*, 152 NY 159, 162 [1897]; *Flyer v. Sullivan*, 284 AD 697, 699 [1ʺ Dept 1954]), and may be effectuated by delivery alone (see id.).

> "Where plaintiff is the assignee of a mortgage at the time of service of the complaint, plaintiff has standing and is entitled to commence a proceeding its own name (citation omitted.).. " (*Bankers Trust Co. v. Hoovis,* 263 AD2d 937, 938 [3d Dept 1991]). As in this matter, when a retroactive written assignment is executed after the commencement of the action, in the absence of proof of actual delivery of the note and mortgage prior to the commencement of the action, the retroactive assignment is insufficient to confer standing upon the assignee (OneWest) in a foreclosure action (see *LaSalle Bank National Association v. Ahearn,* 59 AD3d 911 [3d Dept. 2009]; *Wells Fargo Bank, N.A. v. Marchione,* 887 NYS 2d 615 [2ⁿᵈ Dept 2009]).

33. Claimants, on research, information and belief, thereon allege the assignment by MERS is a retroactive assignment executed after the commencement of the foreclosure action and insufficient alone to confer standing upon OneWest in this foreclosure action. See Exhibit 2, ¶ 6.

34.  Claimants, on research information and belief, thereon allege that  for  Defendants to support having standing to foreclose on the Cartagena mortgage, notwithstanding its retroactive written assignment executed after the commencement of this action, OneWest states it purchased the assets of IndyMac on March 19,2009, and it then became and remains the owner and holder of the Cartagena note and mortgage. However, as previously noted,  OneWest has not submitted proof in evidentiary form to establish that the Cartagena note and mortgage was included in the IndyMac assets sold and delivered by the FDIC to OneWest on or about March 19,2009. "Beyond possession of the note indorsed in blank (which can be presumptive evidence of its ownership (*see Glynn* v. *United Steel Works Corp.,* 160 Misc. 405), the only evidentiary proof submitted by OneWest that it is also the owner and holder of the Cartagena mortgage is the December 11, 2008 MERS assignment, which is stated to be effective as of December 22, 2008. See Exhibit 1; and Exhibit 2, ¶ 9.

35. Claimants, on research, information and belief, thereon allege, in the absence of Note and Mortgage which must include an indorsement of the Cartagena note by the FDIC, or other evidentiary proof establishing that the subject note and mortgage was assigned to OneWest by the FDIC, the December 11th 2008 MERS assignment is controlling. OneWest's unsubstantiated claim that it acquired the Cartagena note and mortgage as past of its March 19, 2009 purchase of IndyMac assets from the FDIC is insufficient to establish that OneWest became the holder of the subject note and mortgage prior to the commencement of the foreclosure action. Exhibit 2, ¶ 9.

36. Claimants, on research, information and belief, thereon allege the statements of OneWest's attorneys in its Foreclosure, and Requests for Extensions, and Motion to Dismiss are conclusory only, and thus fail to establish that the FDIC actually transferred the Cartagena note and mortgage as part of its receivership of IndyMac.

37. Fact: IndyMac Bancorp filed for Chapter 7 bankruptcy on July 31, 2008.

38. On June 30, 2008, the Center for Responsible Lending, a Washington think tank, released a report compiling information from various lawsuits filed by customers and former employees of IndyMac Bank, and alleged that managers and supervisors were being pressured to approve loans or risk being fired.[45][46] Before its collapse, IndyMac denied the allegations in the report.

39. Claimants, on research, information and belief, thereon allege that IndyMac's purported loan was An Alt-A mortgage, which is short for Alternative A-paper, which is a type of U.S. mortgage that, for various reasons, is considered riskier than A-paper, or "prime", and less risky than "subprime," the riskiest category. For these reasons, as well as in some cases their size, Alt-A loans are not eligible for purchase by Fannie Mae or Freddie Mac. Alt-A interest rates, which are determined by credit risk, therefore tend to between those of prime and sub-prime home loans, although there is no single accepted definition of Alt-A[1]. Typically Alt-A mortgages are characterized by borrowers with less than full documentation, lower credit scores, higher loan-to-values, and more investment properties[2]. A-minus is related to Alt-A, with some lenders categorizing them the same, but A-minus is traditionally defined as mortgage borrowers with a FICO score of below 680 while Alt-A is traditionally defined as loans lacking full documentation[3].

40. Claimants, on research, information and belief, thereon allege that the Defendants and each of them, in so acting in this case and with respect to many other mortgage or trust deed security instruments engaged and continue to engage in a pattern and practice of utilizing judicial foreclosure procedures of

---

[1]Lemke, Lins and Picard, Mortgage-Backed Securities, Chapter 3 (Thomson West, 2013 Ed.);

[2]Lemke, Lins and Picard, Mortgage-Backed Securities, Chapter 3 (Thomson West, 2013 Ed.);

[3]Fabozzi, Fj. (2005).The handbook of mortgage-backed securities, pp. 207-57. (McGraw-Hill Professional.)

---

this State to foreclose on properties when they do not, in fact, have the right to do so, knowing that the property owners affected do not have the knowledge and means to contest the right of said Defendants to do so.

41.   Claimants on research, information and belief, thereon allege that when the loan closed the Defendants and each of them, transferred, sold, assigned the note immediately to MERS who assigned MIN number, the security instrument was obsolete.

42.   Claimants, on research, information and belief, thereon allege that when the loan closed, the Defendants and each of them, transferred, sold, and/or assigned the note immediately to a Mortgage Backed Security ("MBS") causing the security instrument to be obsolete. Or,

43.   Claimants, on research, information and belief, thereon allege that when the loan closed, the Defendants and each of them, transferred, sold, and/or assigned the note immediately to Mortgage Electronic Registration System who caused a MERS Identification Number ("MIN") to be assigned causing the security instrument to be obsolete.

44.  Claimants, on research, information and belief, thereon allege that when the security instrument became obsolete the original beneficiary no longer existed.

45.  Claimants, on research, information and belief, thereon allege that when the security instrument became obsolete the original Trustee no longer exists after the transfer, selling and/or assignment of the note to a MBS.

46.  Claimants, on research, information and belief, thereon allege that when the security instrument became obsolete the original Trustee no longer exists after the transfer, selling and/or assignment of the note to a MERS.

47.  Claimants, on research, information and belief, thereon allege that Defendants and each of them, failed to record in the Broward county Recorder's Office in the Public Records any

transfer, selling or assignment of the security instrument wherein any new beneficiary or trustee was granted the power to execute the power of sale and judicial foreclosure contained within the original security instrument. See Exhibit 2, ¶ 6.

48. Claimants, on research, information and belief, thereon allege the Defendants and each of them, were the only drafter of documents in the loan proceedings.

49. Claimants, through this pleading demands further a detailed accounting of how the amount stated in the Notice of Default and Notice of Trustee Sale necessary to be paid to redeem the property from foreclosure has been calculated so that Plaintiff can adequately evaluate Claimants rights under the law with Claimants pre-sale rights of reinstatement and redemption.

50. The subject property is unique. Therefore, should Defendants, and each of them, not be enjoined, Plaintiff will suffer irreparable injury for which there is no adequate remedy in law when Defendants proceed to sell the subject property to a third party who might be a genuine purchaser for value.

51. In all of the wrongful acts alleged in this claim, the Defendants and each of them have utilized the United Mail in furtherance of their pattern of conduct to unlawfully collect on negotiable instruments when they were not entitled under the law to do so (see Exhibit 2 ¶ 9), and, assuming *arguendo* that they did have the right to proceed to foreclosure under the note, to profit from those actions in amounts greater than their rights under the note to do so.

52. Claimants, on research, information and belief, thereon allege Defendants and each of them, in committing the acts alleged in this case are engaging in a pattern of unlawful activity.

53. As a result thereof, Claimants have been damaged in having to consult with an attorney before bringing this action, and has had to hire a paralegal and a forensic auditor to do research into the subject matter and will have to incur attorney and expert witness fees to stop the wrongful acts of the Defendants and each of them. Claimants have been damaged in other

ways that are not readily apparent at this time, but will amend this complaint to allege further damages as they are determined.

54. Claimants, on research, information and belief thereon allege when Defendants pursued judicial foreclosure, Defendants and each of them represented that they had the right to payment under the original note (hereinafter "note"), payment of which was secured by the security instrument.

55. Claimants, on research, information and belief allege that the true facts are thus: the Defendants, nor their attorneys were not in possession of the note and they were not either holders or the note or non-holders of the note entitled to payment, as those terms are used in Title XXXIX (39) Uniform Commercial Code: Negotiable Instruments §§673.3011, 673.3021, and therefore they were proceeding to foreclosure non-judicially without right under the law (see Exhibit 2, ¶ 9). Further, they added costs and charges to the payoff amount of the note that was not justified and proper under the terms of the note or the law.

56. Claimants, on research, information and belief, thereon allege the Defendants and each of them misrepresented the facts intending either to force Claimants to pay large sums of money to Defendants and each of them to which there not entitled under the law, or to abandon Claimants property to foreclosure sale.

57. Claimants, on research, information and belief, thereon allege that Claimants are the nominal payor on the subject promissory Note. The Loan Seller, i.e., the purported Initial Lender that allegedly funded the loan, and each of them, is/was a financial institution that was paid a fee to pose as a residential mortgage lender, when in fact the source of loan funds and the actual lender (Investors in Certificates) and underwriter (Mortgage Aggregator and Investment Banker) were other parties which identities and receipt of fees and profits were withheld from Claimants at Closing and despite numerous requests continue to be withheld from Claimants by the Defendants and each of them contrary to the requirements of Federal Law and applicable State Law.

58.  Claimants, on research, information and belief, thereon allege that Unknown to Claimants, Defendant IndyMac Bank FSB, acted as the Loan Seller and principal in its relationship with the "independent appraiser" of the property, and mortgage broker conspired and took affirmative steps to induce the Claimants into a transaction that did not and could not meet normal underwriting standards for a residential mortgage.  The Loan Seller, i.e., the Initial Lender, posed as a conventional mortgage lender thus lending Claimants to reasonably believe that the purported Loan Seller, the purported mortgage broker, and the purported loan originator had an interest in the success (repayment of the loan) of the transaction that Claimants were induced to believe was being executed at the time of the "closing" of the subject loan transaction.

59.  Claimants, on research, information and belief, thereon allege that, in fact, the Loan Seller, Mortgage Broker/Originator, Appraiser, Title Company, Escrow Company, and Trustee on the Deed of Trust, had no financial stake (i.e., liability) in the transaction and not interest other than obtaining Claimants signature on a "loan" that could never be repaid, contrary to representations and assurances from the conspiring participants in this constructive fraudulent scheme.

60. Claimants, on research, information and belief, thereon allege that, in fact, the "Appraisal" was intentionally and knowingly inflated along with other loan data to justify the closing of the purported "loan transaction."  Claimants relied upon the due diligence of the purported "Lender" (i.e., actually the Loan Seller) in executing and accepting the closing documents.

61. Claimants, on research, information and belief, thereon allege in fact, no "lender" was involved in the closing in the sense of an entity performing due diligence and evaluation pursuant to national standards for underwriting and evaluation risk of loaning money in a residential loan closing. Thus, no bank or other financial institution actually performing under the standard, rules and regulations governing such institutions was the "lender" which is the

basis for Claimants cause of action for usury, To Wit: That the inflated appraisal added an undisclosed cost to the loan which when added to the other terms, disclosed and undisclosed, and amortized over the real expected life of the "loan" exceeds the limits set by the State legislature for usury and is not subject to exemption because the presence of a financial institution in the transaction was a ruse in which the form of the transaction covered over and mislead the Claimants as to the real parties in interest and the fees generated by the production of the subject "loan transactions."

62. Claimants, on research, information and belief, thereon allege that Defendants and each of them, their purpose was solely to collect fees, rebates, kickbacks and profits that were never disclosed to Claimants, and have only recently been discovered by Claimants through consultation with experts in securitization of residential mortgage loans, and diligent research, including the filings of some parties with the Securities and Exchange Commission which disclose the normal manner of operating this constructive fraudulent scheme.

63. Claimants, on research, information and belief, thereon allege that the Loan Seller was named as the Payee on the subject promissory note and the beneficiary under the mortgage terms allegedly securing the performance under the subject note.

64. Claimants, on research, information and belief, thereon allege there is no "Trustee" named as the Trustee on the Deed of Trust executed at the time of the alleged "closing" of the "loan transaction." In accordance with State law, there must be a Trustee named in the Trust Deed/Mortgage or the Instrument is void.

65. Claimants, on research, information and belief, thereon allege that upon securitization transfer or assignment the original "Trustee" of the Deed of Trust was replaced with a new unknown or the recording of the Assignment and Acceptance of the new Trustee at the county recorder's

office in the Public Records. This may be moot as there was never any trustee appointed on the Deed of Trust/Mortgage.

66. Claimants, on research, information and belief, thereon allege Notwithstanding the above, and without the knowledge of the Claimants, the Loan Seller had entered into Assignment and Assumption Agreements with one or more parties and Pooling and Service Agreements with one or more parties including but not limited to the mortgage aggregator prior to or contemporaneously with the "Closing" of the subject "loan transaction" with disclosure to Claimants. Under the terms of these agreements, the Loan Seller received a sum of money (the true amount is unknown to Claimants), usually on receiving an application for a loan equal to the gross amount of the loan sought by Claimants plus a fee of 2.5% or more which was allocated to the subject loan transaction.

67. Claimants, on research, information and belief, thereon allege, Contrary to the documents presented before and during the "closing" of the "loan transaction" the Loan Seller was neither the source of funding nor the actual "Lender." Thus at the time of recording, the source of funding and the "Lender" was a different entity than the nominal mortgage or beneficiary under the deed of trust and was neither named nor disclosed in any fashion to the Claimants or to the Public by recording of this information in the Public Recorder's Office. The security for the "loan" thus secured an obligation that had been paid in full by a third party. Said third party was acting as a financial institution or "Lender" without even having been chartered or registered to do so despite regulations to the contrary from laws and rules of State and Federal authorities and/or agencies.

68. Claimants, on research, information and belief, thereon allege some form of documentation represented by the Loan Seller to the Mortgage Aggregator was presented before or contemporaneously with the "closing" of the loan transaction. In some cases the documentation has included actual copies

of the documents presented at "Closing." In most cases it consisted of either forged blank notes or vague descriptions of the content of the notes that were placed into the pool of assets that would be "securitized." Claimants have discovered numerous cases in which the "loan closing" either did not take place at all or included documentation substantially different than the original offer and acceptance and substantially different that what could have been reported to the Mortgage Aggregator prior to the "closing." Claimants have discovered numerous cases in which foreclosure has proceeded despite the fact that no loan closing was ever consummated, no papers were ever signed, or the loans were properly rescinded under the law.

69. Claimants, on research, information and belief, thereon allege Claimants do not know what version of documentation was presented to the Mortgage Aggregator (no disclosure was made to Claimants so this entity is unknown to Claimants) took one or more varying descriptions of the alleged "loan documents" into more than one pool of assets (the exact pool Claimants note went to is unknown) which was eventually sold for the purpose of securitizing the assets of the pool which included the subject loan transaction either once or more than once. Claimants seek this information through discovery.

70. Claimants, on research, information and belief, thereon allege there is no assignment of the subject mortgage on the county records (see Exhibit 2, ¶ 6.), but there is a non-recorded "Pooling and Services" Agreement and a non-recorded Assignment and Assumption Agreement with appears to substitute the Trustee over the pooled assets for the nominal Trustee in the Deed of Trust. The powers of the second Trustee were in turn transferred to either a Trustee for a Special Investment Vehicle ("SIV") (which performed the accounting and reporting of the pool assets) or to an investment bank Collateral Debt Obligation ("CDO") manager whose department performed the accounting and reporting of the pool assets. The reporting assets consisted principally of descriptions of the notes "signed" by borrowers and limited descriptions of the general terms

of the note such that the note appeared to be more valuable than the initial terms of payment by the "borrower(s)."

71. Claimants, on research, information and belief, thereon allege the note from the subject "loan transaction" was eventually allocated into a new corporation (Special Purpose Vehicle 'SPV') formed for the express purpose of holding the pooled assets under certain terms. The terms included the allocation of payments from one note to pay any deficiency in payment of another note in unrelated "loan transactions" contrary to the terms of each such note which required payments to be allocated to the principal, interest, escrow and fees associated with only that specific "loan transaction." Whether such "deficiency" was caused by the difference between the higher general terms of description of the note or the lower actual payment requirements from the "borrower" is not known. Claimants seek this information through discovery.

72. Claimants, on research, information and belief, thereon allege the Investment Banking firm arranged, through payment, for a constructive false inflated appraisal of the certificates and/or issuer of the certificates that would be sold to investors, in much the same was as it had procured the constructive false appraisal of the property that "secured" the "loan transaction." In addition, insurance was purchased from proceeds of this transaction, credit default swaps were purchased from proceeds of this transaction, the investors investments were "oversold" to create a reserve pool from which the SPV could pay deficiencies in payments, and the SPV created cross-collateralization agreements and over-collateralization of the pool assets to assure payments to the investors, thus creating co-obligors on the payment stream due from the Claimants on the subject "loan transaction."

73. Claimants, on research, information and belief, thereon allege the pool of assets, including the Claimants subject "loan transaction" was pledged completely to the owners of the "asset-backed securities" ("ABS"). All the certificates were then transferred to a Seller who in turn sold the

certificates in varying denominations, each of which had slightly different terms depending upon which segment of the pool (tranche) secured the investment.

74. Claimants, on research, information and belief, thereon allege if there is a holder in due course of the Claimants note arising from the subject "loan transaction," it is the investors who purchased said securities (certificates).  Some of said securities are held by the original purchaser thereof, others were sold at weekly auction markets, others were paid by re-sales of property that was "secured," others were paid from pre-payments, others were paid by sale at full or partial price to the investment bank that originated the entire transaction, some of which might be held by the Federal Reserve as non-recourse collateral, and others might have been paid by one or more of the insurance, credit default swaps, cross guarantees or cross collateralization of the segment of the pool that secured the relevant investor who owned certificates backed by a pool of assets that included the subject "loan transaction."

75.  Claimants, on research, information and belief, thereon allege it is doubtful that any of the Defendants and each of them have any knowledge or have made any effort to determine whether the putative holders in due course have been paid in whole or in part.  *__It can only be said with certainty that these Defendants and each of them seek to enforce loan documents for which they have already been paid in full, plus illegal fees for participating in an illegal constructive scheme__*.

76. Claimants, on research, information and belief, thereon allege these Defendants and each of them seek to add insult to injury by demanding ownership of the property in addition to the receipt of payment in full long before any delinquency or default even allegedly occurred.

77. Claimants, on research, information and belief, thereon allege that in order for the Defendants and each of them to maintain legal standing in connection with the subject loan transaction they are required to show the entire chain of title of the note and the entire chain of title of the mortgage.  They refused to do this despite numerous requests, leading Claimants to conclude that Defendants and each of them

cannot produce such evidence of a complete chain of title or are intentionally withholding the information that would show breaks in such chain.  Instead of producing the original Note and Deed (Mortgage) they've only produced a lost note affidavit, and a bond that does not cover the amount in controversy.

78.   Claimants, on research, information and belief, thereon allege that they are left in the position of being in an adversary proceeding with ghosts.  While these Defendants have informally offered or considered providing indemnification for any third party claims, the fact remains that any relief awarded these defendants, any standing allowed to these defendants would expose the Claimants to multiple claims and suits from an unknown number of parties and entities that all claim, possibly correctly, to be holders in due course.  Any grant of a certificate of title to an entity other than Claimants or the nominal mortgagee creates an incurable defect in title.

79.   Claimants, on research, information and belief, thereon allege that there is no recording of any document in the county records which predates the Defendant's attempt to initiate foreclosure and/or eviction which would authorize them to proceed.

## SIGNIFICANCE OF REMIC

80.   Claimants, on research, information and belief, thereon allege that Mortgage backed Securities ("MBS") Certificates are "pass through certificates," where the Trust has elected to be treated as a Real Estate Mortgage Investment Conduit ("REMIC") to enjoy the tax exempt status allowed under 15 U.S.C. §§806A-G  REMIC trust. REMIC regulations impose very strict limitations as to the nature of the investments a REMIC trust may make (i.e., "permitted investments") and transactions which it may not undertake (i.e., "prohibited transactions").  Any violation of  REMIC regulations have significant tax implication for the Trust, as well as all Certificate holders.

81.   Claimants, on research, information and belief, thereon allege only income from "qualified mortgages" and "permitted investments" may enter a REMIC trust.  A "qualified mortgage" is an obligation (i.e., mortgage) which is principally secured by an interest in real property which:

> (1) was transferred to the Trust on the startup date;

> (2) was purchased by the REMIC Trust within 3 months after the startup date; or

> (3) any qualified replacement mortgage.

Permitted investments are limited to:

> a) Cash Flow Investment ("CFI") (i.e., temporary investment where the Trust holds money it has received from qualified mortgages pending distribution to the certificate holders);

> b) Qualified Reserve Assets ("QRA") (i.e., any intangible property which is held for investment and is part of a reasonably required reserve to provide for full payment of expenses of the REMIC or amounts due on regular interest in the event of default on qualified mortgages or lower than expected returns on cash flow investments. These investments are for every defined purpose and are to be passive in nature. They must be "reasonably required";

> c) Liquidation Proceeds from "foreclosed property" which is acquired in connection with the default or imminent default of a "qualified mortgage" held by the Trust.

82.  Claimants, on research, information and belief, thereon allege that in order to maintain the REMIC status, the Trustee and the Servicers must ensure that the REMIC receives no income from any asset that is not a "Qualified Mortgage" or a "Permitted Investment," 26 U.S.C. §806(F)(a)(2)(B).

> a) Prohibited Transactions include the disposition of a qualified mortgage (except where the disposition is "incident to" the foreclosure, default, or imminent default of the mortgage); or the receipt of any income from an asset that is not a Qualified Mortgage or a Permitted Investment, 26 U.S.C. §860(F)(a)(2)(B).

> b)   Prohibited Transactions are taxed in an amount 100% of the REMIC's net income from such prohibited transactions, 26 U.S.C. §806(a)(1).

c)  Contributions to facilitate a "clean up call" (i.e., the redemption of a class of regular interest, when by reason of prior payments with respect to those interests the administrative costs associated with serving that class outweigh the benefits of maintaining the class, Reg. §1.8-6G-2(j)(1).

## Any Case: Payment In The Nature Of A Guarantee, Such As Payments To The REMIC

83.  Claimants, on research, information and belief, thereon allege that any violation of REMIC regulations will defeat the privileged tax status and will subject the REMIC to 100% taxation, plus penalties and interest.  These taxes and penalties are ultimately borne by the Certificate holders, under surety bond, letter of credit or insurance policy.

a) Any cash contribution during the three (3) month period after the start-up day; and

b) Any cash contribution to a qualified reserve fund made by a holder of a residual interest.

c) On a monthly basis, the Investment Banking firm and/or its agents, servants, personal or employees complied, individually and in concert, oversaw and approval all the information contained in the Distribution Reports ("DR") and electronically sent same to certain parties. The date regarding the number of bankruptcies, aggregate Special Servicing Fees ("SFS"), and aggregate Trust Fund Expenses was routinely incomplete, constructively false, and/or misleading.

d) The Distribution Reports are supposed to accurately reflect the "financial health of the trust," and provide Certificate holders with important date such as the number of loans in bankruptcy, the aggregate amount of SPS, and the aggregate amounts of trust fund expenses. Each an ever one of these categories is essential to assess its profits and loss potential in the REMIC entity. Furthermore, this date is used by bond rating agencies to assess the value of the Certificates.

e) Based upon the filings and information of the Claimants, it appears that no accurate accounting has ever been presented to anyone, especially to Claimants, and that therefore the identity and status of any putative holder in due course is completely shrouded in secrecy,

enforced by these Defendants, and each of them plus their agents, servants, personal and employees. Unreported repurchases of certificates or classes of certificates would and did result in a profit to the REMIC that went unreported, and which was not credited to Borrowers where the repurchase was, as was usually the case, far less than the original investment. While the Claimants would never have entered into a transaction if there was full disclosure made to Claimants by Defendants and each of them disclosing the true nature of this scheme was revealed, any profits, refunds, rebates, fees, points, costs, or other income or gain should be credit on some basis to said borrowers including Claimants herein.

f) At no time whatsoever did Defendants and each of them ever advise Claimants that:

    i) The mortgage loan being processed was not in their best interest;

    ii) That the Claimants promissory note was equal to money;

    iii) That the Claimants could make either a general or special deposit of their promissory note;

    iv) That the originating "lender," had no intention of retaining ownership interest in the mortgage loan or fully servicing same and in fact and may have already pre-sold the loan, prior to closing, to a third party mortgage aggregator.

    vi) That the mortgage loan was actually intended to be repeatedly sold and assigned to multiple third parties without disclosure to the Trustor of the deed of trust, including one or more mortgage aggregators and investment bankers (including but not limited to Defendants and DOES 1-2000), for the ultimate purpose of bundling the Claimants mortgage with hundreds or perhaps thousands of others without disclosure to Claimants as part of a companion, support, or other tranche in connection with creation of a REMIC "mortgage-backed security" to be sold by a securities firm (and which in fact ended up collateral for Asset-Backed Securities Certificates, created the same year as the closing);

vii) That the mortgage instrument and Promissory Note may be sold, transferred, or assigned separately to separate third parties so that the later "holder" of the Promissory Note may not be in privity with or have the legal right to foreclose in the event of default;

viii) That in connection with the multiple down-line resale and assignment of the mortgage and Promissory Note that assignees or purchasers of the Note may make "pay-downs" against the Note which may affect the true amount owed by the Claimants on the Note;

ix) That a successive assignee or purchaser of the Note and Mortgage may not, upon assignment or purchase, unilaterally impose property insurance requirements different from those imposed as a condition of the original loan (also known as prohibition against increased forced-placed coverage) without the Claimants prior notice and consent.

g) As a result of the closing and in connection therewith, Defendants and each of them placed Claimants into a loan that vast number of elements were not disclosed to Claimants causing the agreements to be unconscionable and misleading. Defendants engaged in material omissions by failing to disclose to Claimants the fact that Claimants were being into a mortgage program despite not being fully qualified for such a program.

h) Prior to the closing, Defendants failed to provide to Claimants the preliminary disclosures required by the Truth-In-Lending Act pursuant 12 C.F.R. §226.17 and 226.18 (also known as an referred to herein as "Regulation Z"), and Defendants failed to provide the preliminary disclosures required by the Real Estate Settlement Procedures Act ("RESPA") pursuant to 24 C.F.R. §§3500.6 and 3500.7, otherwise known as the GFE.

i) Defendants also intentionally failed and/or refused to provide Claimants with various disclosures which would indicate to the Claimants that the consumer credit contract entered into was void, illegal, and predatory in nature due in part to the fact that the final TILA, showed a "fixed rate" schedule of payments, but did not provide the proper disclosure of the actual contractually–due amounts and rates.

j) Defendants failed and/or refused to provide a HUD-1 Settlement Statement at the closing which reflected the true cost of the consumer credit transaction. As Defendants failed to provide an accurate GFE or Itemization of Amount Financed ("IOAF"), there was no disclosure of a Yield Spread Premium ("YSP,)" which is required to be disclosed by the Truth-In-Lending Act) and thus so disclosure of the true cost of the loan.

84. Claimants, on research, information and belief, thereon allege that "YSP" means the money or rebate paid to a mortgage broker for giving a borrower a higher interest rate on a loan in exchange for lower up-front costs, generally paid in Origination fees, Broker fees or Discount Points. This "may [be used to] wipe out or offset other loan costs, like Loan Level Pricing Adjustments concerning the subject property.

85. Claimants, on research, information and belief, thereon allege that Claimants were not informed by the original Lender if the loan was connected with FNMA, HUD, FREDMAC, or some other governmental owned entity.

86. Claimants, on research, information and belief, thereon allege that as a direct and proximate result of these failures to disclose as required the Truth-In-Lending Act, Defendants received a YSP in a substantial amount without preliminary disclosure, which is a *per se* violation of 12 C.F.R. §§§§266.4(a), 226.17, 266.18(d) and 266.18(c)(1)(iii). The YSP raised the interest rate which was completely unknown to or approved by the Claimants, as they did not receive the required GFE or IOAF.

87. Claimants, on research, information and belief, thereon allege that in addition, the completely undisclosed YSP was not disclosed by Defendants in their broker contract, which contract was blank in the area as to fees to be paid to Defendant. This is an illegal kickback in violation of 12 U.S.C. §2607, as well as State law which gives rise to all damages claims for all combined broker fees, costs, and attorney's fees.

88.  Claimants, on research, information and belief, thereon allege that the amount financed within the TILA is also understated, which is a material violation of 12 C.F.R. §§226.17 and 266.18, in addition to 15 U.S.C. §1602(u), as the amount financed must be completely accurate with no tolerance.

89.  Claimants, on research, information and belief, thereon allege Defendants were under numerous legal obligations as fiduciaries and had the responsibility for overseeing the purported loan consummation to insure that the consummation was legal, proper; and that Claimants received all legally required disclosures pursuant to the Truth-In-Lending Act and RESPA both before and after closing.

90.  Claimants, on research, information and belief, thereon allege that Claimants, not being in the consumer lending, mortgage broker, or residential loan business, reasonably relied upon the Defendants to insure that the consumer credit transaction was legal, proper, and complied with all applicable laws, rules, and regulations.

91.  Claimants, on research, information and belief, thereon allege that at all times relevant hereto, Defendants regularly extended or offered to extended or offered to extend consumer credit for which a finance charge is, or may be imposed, or which, by written agreement, is payable in more than four (4) installments, and was initially payable to the person the subject of the transaction, rending Defendants "creditors" within the meaning of the Truth-In-Lending Act, 15 U.S.C. §1602(f) and Regulation Z §226.2(a)(17).

92.  Claimants, on research, information and belief, thereon allege that at the closing of the subject "loan transaction," Claimants executed Promissory Notes and Security Agreements in favor of Defendants as aforesaid.  These transactions, designed by Defendants as a Loan, extended consumer credit which was subject to a finance charge and which was initially payable to the Defendants. As part of the consumer credit transaction the subject of the closing, Defendants retained a security interest in the subject property which was Claimants principal residential dwelling.

93.  Claimants, on research, information and belief, thereon allege that Defendants engaged in a pattern and practice of defrauding Claimants, in that, during the entire life of the mortgage loan, Defendants failed to properly disclose credit payments made; incorrectly calculated interest on the account; and have failed to accurately debit fees.  At all times material, Defendants had actual knowledge that the Claimants account were not accurate, but that Claimants would make further payments based on Defendants' inaccurate account.

94.  Claimants, on research, information and belief, thereon allege that Claimants made payments based on the Defendants' improper, inaccurate, and constructive fraudulent (mis)representations at or to Claimants account.

95.  Claimants, on research, information and belief, thereon allege that as a direct and proximate result of the actions of the Defendants set forth above, Claimants overpaid in interest.

96.  Claimants, on research, information and belief, thereon allege Defendants also utilized amounts known to the Defendants to be inaccurate to determine the amount allegedly due and owing for purposes of foreclosure.

97.  Claimants, on research, information and belief, thereon allege Defendants' violations were all material in nature under the Truth-In-Lending Act.

98.  Claimants, on research, information and belief, thereon allege that said violations, in addition to the fact that Claimants did not properly receive Notices of Right to Cancel, constitute violations of 15 U.S.C. §1635(a) and (b) and 12 C.F.R. §226.23(b), and are thus a legal basis for, and legally extend Claimants rights to exercise the remedy of rescission.

99.  Claimants, on research, information and belief, thereon allege, Defendants assigned the Note and Mortgage whose parties were not disclosed, and are unknown to Claimants, who did not take these instruments in good faith, or, without notice that the instruments were invalid or, that Claimants have a claim in recoupment.

100.  Claimants, on research, information and belief, thereon allege that, given that the consumer credit transaction was an "intertemporal transaction" with "multiple assignments" as part of an aggregation and this creation of a REMIC tranche itself was part of a predetermined and identifiable Collateralized Mortgage Obligation ("CMO"), resulting in "all Defendants having shared in the illegal proceeds of the transaction;  Conspired with each other to constructively defraud the Claimants out of the proceeds of the loan"; Constructively acted in concert to wrongfully deprive the Claimants of their residence;  Acted in concert and conspiracy to essentially steal the Claimants home and/or convert the Claimants home without providing Claimants reasonably equivalent value in exchange;   And conducted an illegal enterprise within the meaning of Civil Rico statute.

101.  Claimants, on research, information and belief, thereon allege, given the volume of residential loan transaction solicited and processed by the Defendants, the Defendants have engaged in two or more instances of racketeering activity involving different victims but utilizing the same method, means, mode, operation, and enterprise with the same intended result.

102.   Claimants, on research, information and belief, Defendants caused a judicial foreclosure of Claimants home located at 2208 NW 8th Terrace, Wilton Manors, Florida, which took place on June 18, 2009.

103.  Claimants, on research, information and belief, thereon allege Defendants, lacked standing to cause a judicial foreclosure to take place on Claimants property and original promissory note because, at the time the Defendants initiated the foreclosure proceedings against Claimants, the Defendants were not the holder in due course of Claimants original promissory note, with regard to the subject property.

104.   Claimants, on research, information and belief, thereon allege that said sale was illegal, constructively fraudulent, or willfully oppressive, of Claimants property under a power of sale contained in a mortgage or deed of trust that was obsolete.

105. Claimants, on research, information and belief, thereon allege that the amount stated as due and owing in the notice of default is incorrect for one or more of the following reasons:

    a) A constructively fraudulent appraisal was used to inflate the value of the home and hence the amount of the loan;

    b) An incorrect interest rate adjustment;

    c) Incorrect tax impound;

    d) Misleading payments;

    e) Unnecessary forced placing of insurance;

Upon conducting and completing discovery, the reasons will be set forth with more particularity.

## CLAIMS FOR RELIEF

## COUNT 1: VIOLATIONS OF HOME OWNERSHIP EQUITY PROTECTION ACT

106. Claimants reaffirm and re-allege the above paragraphs as set forth more fully herein below.

107. Claimants, on research, information and belief, thereon allege that in 1994, the United States Congress ("Congress") enacted the Home Ownership Equity Protection Act ("HOEPA"), which is codified at 15 U.S.C. §1639 et. seq., with the intention of protecting homeowners from predatory lending practices by lenders who target vulnerable consumers. HOEPA requires lenders to make certain defined disclosures, and prohibits certain terms from being included in home loans. In the event on noncompliance, HOEPA imposes civil liability for rescission and statutory and actual damages.

107. Claimants, on research, information and belief, thereon allege that Claimants are "consumers," and each Defendant is a "creditor," as defined by HOEPA. In the mortgage loan transaction at issue here, Claimants were required to pay excessive fees, expenses, and costs which exceeds more than 10% of the amount financed.

108.   Claimants, on research, information and belief, thereon allege that pursuant HOEPA, and specifically, 15 U.S.C. § 1639(a)(l), and 494.00792(1)(a) et seq., each Defendant is required to make certain disclosures to the Claimants,  which disclosures are to be made conspicuously, and in writing, no later than three (3) days prior to said closing:

> "You are not required to complete this agreement merely because you have received these disclosures or have signed a loan application.  If you obtain this loan, the lender will have a mortgage on your home.  You could lose your home and any money you have put into it, if you do not meet your obligation under the loan."

109.  Claimants, on research, information and belief, thereon allege that Defendants violated HOEPA by numerous acts and material omissions, including, but not limited to:

> a) Failing to make the foregoing disclosure in a conspicuous (written) fashion;

> b) Engaging in a pattern and practice of extending credit to Claimants without regard to their ability to repay in violation of 15 U.S.C. §1639(h).

110.  Claimants, on research, information and belief, thereon allege by virtue of the Defendants' multiple violations of HOEPA, Claimants have a legal right to rescind the consumer credit transaction, which is the subject of this action pursuant 15 U.S.C. §1635.  This claim is to be construed, for these purposes, as formal and public notice of Claimants Notice of Rescission of the mortgage and note.

111.  Claimants, on research, information and belief, thereon allege Defendants further violated HOEPA by failing to make additional disclosures, including, but not limited to, Claimants not receiving the required disclosure of the right to rescind the transaction;  The failure of Defendants to provide an accurate TILA disclosure(s); And, the amount financed being understated.

112.  Claimants, on research, information and belief, thereon allege that as a direct and consequence of, and in connection with Claimants legal and lawful exercise of their right of rescission, the true "lender" is required, within twenty (20) days of this Notice of Rescission, to:

a) Desist from making any claims for finance charges in the transaction;

b) Return all monies paid by Claimants in connection with the transaction to the Claimants;

c) Satisfy all security interests, including mortgages, which were acquired in the transaction.

113.  Claimants, on research, information and belief, thereon allege that Upon the true "lenders" full performance of its obligations under HOEPA, Claimants shall tender all sums to which the true "lender" is entitled.

114.  Claimants, on research, information and belief, thereon allege that Defendants failed to disclose in the Note failed to contain the notice under Florida Fair Lending Act 494.00792 and  in particular subsection (c)

Notice: This is a mortgage subject to the provisions of the Florida Fair Lending Act. Purchasers and assignees of this mortgage could be liable for all claims and defenses with respect to the mortgage which the borrower could assert against the creditor.

115. Claimants, on research, information and belief, thereon allege that based on Defendants' HOEPA violations, each of the Defendants are liable to the Claimants for the following, which Claimants demand as relief:

a) Rescission of the mortgage loan transaction;

b) Termination of the mortgage and security interest in the property the subject of this mortgage loan documents created in this transaction by the Defendants'.

c) Return of any money or property paid by the Claimants including all payments made in connection with the transactions;

d) An amount of money equal to twice the finance charge in connection with the transaction;

e) Relinquishment of the right to retain any proceeds; and

f) Actual damages in an amount to be determined at trial,

g) Costs;

h) Attorney's fees, and like attorney fees.

# COUNT 2: VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT

116.  Claimants reaffirm and re-allege paragraphs above herein as though full set forth herein.

117. Claimants, on research, information and belief, thereon allege that Defendants as mortgage lenders, Defendants are subject to the provisions of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. §2601 et. seq..

118. Claimants, on research, information and belief, thereon allege that Defendants are in violation of 12 U.S.C. §2607;  And, in connection with the mortgage loan to Claimants, the  Defendants accepted charges for the rendering of real estate services which were in fact charges for other, than services actually performed.

119.  Claimants, on research, information and belief, thereon allege that as a result of the Defendants violating RESPA, Defendants are liable to Claimants in an amount equal to three (3) times the amount of charges paid by Claimants for "settlement services" pursuant to 12 U.S.C. §2607)d(2).

# COUNT 3: VIOLATIONS OF FEDERAL TRUTH IN LENDING ACT

120.  Claimants reaffirm and re-allege paragraphs above herein as though set forth fully herein.

121.  Claimants, on research, information and belief, thereon allege that, Defendants failed to include and disclose certain charges in the finance charge section shown on the TILA statement, which charges were imposed on Claimants incident to the extension of credit to the Claimants, and were required to be disclosed pursuant to 15 U.S.C. §1605, and Regulation Z § 226.4, which resulted in an improper disclosure of finance charges in violation of 15 U.S.C. §1601 et. seq., Regulation Z §226.18(d).  Such undisclosed charges included a sum identified on the Settlement Statement listing the amount financed, which is different from the sum listed on the original Note.

122.  Claimants, on research, information and belief, thereon allege that when Defendants  calculated

the annual percentage rate ("APR"), said was improperly based upon improperly calculated and (un)disclosed amounts, Defendants are in violation of 15 U.S.C. §1601 et. seq., Regulation Z §§§ 226.18(c), 18(d) and 22.

## COUNT 4: VIOLATION OF FAIR CREDIT REPORTING ACT

123. Claimants reaffirm and re-allege paragraphs above herein as set forth fully herein.

124. Claimants, on research, information and belief, thereon allege that at all times material, Defendants qualified as a provider of information to the Credit Reporting Agencies, including but not limited to Experian, Equifax, and TransUnion, and other agencies, under the Federal Fair Credit Reporting Act. Defendants acted without Claimants permission, wrongfully, improperly, and illegally reported negative information, as to the Claimants, to one or more Credit Reporting Agencies, which resulted and has negatively affected and continues to negatively affect Claimants information on their credit reports, and has resulted in the lowering of their FICO scores.

125. Claimants, on research, information and belief, thereon allege that when Defendants violated 16 U.S.C. §1681(a)(2)(b), Claimants are entitled to maintain a private cause of action against Defendants for an award of damages in an amount to be proven at the time of all violations of the Fair Credit Reporting Act, which caused actual damages to Claimants, including emotional distress and humiliation, and has resulted in a loss of friends, social standing in the community, and at large.

126. Claimants, on research, information and belief, thereon allege that Claimants are entitled to recover damages from Defendants for negligent non-compliance with the Fair Credit Reporting pursuant to 15 U.S.C. §1681(o).

127. Claimants, on research, information and belief, thereon allege that they are also entitled to recover damages from Defendants for the willful non-compliance of the Fair Credit Reporting, 15 U.S.C. § 1681(n)(a)(2), in an amount to be proven at time of trial.

# COUNT 5: CONSTRUCTIVE FRAUDULENT MIS-REPERSENTATION

128. Claimants reaffirm and re-allege paragraphs above herein as though set forth fully herein.

129.   Claimants, on research, information and belief, thereon allege Defendants constructively knowingly and intentionally concealed material information from Claimants, which is disclosure is required by Federal Statutes and Regulations to be disclosed to the Claimants, both and at the beginning and closing.

130.   Claimants, on research, information and belief, thereon allege Defendants' constructively misrepresented material information to the Claimants, with full knowledge by Defendants that their affirmative representations were constructively false, fraudulent, and misrepresented the truth, at the time said representations were made.

131. Claimants, on research, information and belief, thereon allege that under the circumstances, the constructive omissions and material misrepresentations by the Defendants were constructively malicious.

132. Claimants, on research, information and belief, thereon allege that Claimants, not being investment bankers, securities dealers, mortgage lenders, or mortgage brokers, reasonably relied upon the representations of the Defendants in agreeing to execute the mortgage loan documents.

133. Claimants, on research, information and belief, thereon allege that had the Claimants known of the falsity of Defendants representations: Plaintiff would not have entered into the transactions, which is the subject of this action.

134. Claimants, on research, information and belief, thereon allege that as a direct and proximate cause of the Defendants' constructive material omissions and material misrepresentations, Claimants have suffered damages.

## COUNT 6: BREACH OF FIDUCIARY DUTY

135. Claimants reaffirm and re-allege paragraphs above herein as though set forth fully herein.

136. Claimants, on research, information and belief, thereon allege that the Defendants, by their actions in contracting to provide mortgage loan services, and a loan program to Claimants, which was not only to be best suited to the Claimants, given their income and expenses, but by which Claimants would also be able to satisfy their obligations without risk of losing their home, Defendants were "fiduciaries," in which Claimants reposed their trust and confidence, especially given that Claimants were NOT, and are NOT investment bankers, securities dealers, mortgage lenders, or mortgage brokers.

137. Claimants, on research, information and belief, thereon allege that the Defendants breached their fiduciary duties to the Claimants by constructive and fraudulently inducing Claimants to enter into a mortgage transaction, which was contrary to Claimants stated intentions; Contrary to the Claimants interests; And, contrary to the Claimants preservation of their home.

138. Claimants, on research, information and belief, thereon allege that as a direct and proximate result of the Defendants' breaches of their fiduciary duties, Claimants have suffered damages.

139. Claimants, on research, information and belief, thereon allege that under the totality of the circumstances, the Defendants' actions were willful, wanton, intentional, and were performed by Defendants with a callous and reckless disregard for the rights of the Claimants, which justifies an award of, not only of actual compensatory damages, but also exemplary, punitive damages, which shall serve to act as a deterrent, including as a barrier as to future conduct of the named Defendants herein, but also to other persons or entities with similar inclinations.

## COUNT 7: UNJUST ENRICHMENT

140. Claimants reaffirm and re-allege paragraphs above herein as though set forth fully herein.

141. Claimants, on research, information and belief, thereon allege that the Defendants had an implied duty, and contract with Claimants to ensure that Claimants understood all fees which would be paid to the Defendants to obtain credit on Claimants behalf, and to not charge any fees which were not related to the settlement of the loan, and to do so with full disclosure to Claimants: the defendants failed in their implied duty, contract to disclose.

142. Claimants, on research, information and belief, thereon allege that the Defendants had full knowledge that a "bait and switch" loan or currency exchange including the rates were a predatory mortgage, with an increase in the interest rate due to the YSP paid to the Broker for the "up sell" and were not in the Claimants best interest. Defendants cannot, in good conscience and equity, retain the benefits from their actions of charging a higher interest rate, fees, rebates, kickbacks, profits and gains and YSP fee, which are unrelated to the settlement services provided at closing.

143. Claimants, on research, information and belief, thereon allege that Defendants have been unjustly enriched at the expense of the Claimants, and maintenance of the enrichment would be contrary to the rules and principles of equity.

144. Claimants, on research, information and belief, thereon allege that the Claimants thus demand restitution from the Defendants in the form of actual damages, exemplary damages, attorney's and like attorney's fees.

## COUNT 8: CONSTRUCTIVE CIVIL CONSPIRACY

145. Claimants reaffirm and re-allege paragraphs above herein as though set forth fully herein.

146. Claimants, on research, information and belief, thereon allege that in connection with the application for, and the consummation of the mortgage loan, which is the subject of this action, and is in connection with Notice of Trustee Sale, which is also the subject of this action, Defendants agreed, between and among themselves, to engage in actions, and a course of conduct designed to further an

illegal act or to accomplish a legal act  by unlawful means, and to commit one or more overt acts in furtherance of the constructive conspiracy to defraud the Claimants.

147.  Claimants, on research, information and belief, thereon allege that the Defendants agreed between and among themselves to engage in the constructive conspiracy to defraud, for the common purposes of accruing economic gains for themselves, at the expense of, and detriment to the Claimants.

148.  Claimants, on research, information and belief, thereon allege that the actions of the Defendants were constructively committed intentionally, willfully, wantonly, and with reckless disregard for the rights of the Claimants.

149.  Claimants, on research, information and belief, thereon allege that, as a direct and proximate result of the actions of the Defendants, in combination resulting in fraud and breaches for the fiduciary duties, Claimants have suffered damages.

## COUNT 9: CONSTRUCTIVE CIVIL RICO

150.  Claimants reaffirm and re-allege paragraphs above herein as though set forth fully herein.

151. Claimants, on research, information and belief, thereon allege that Defendants are "related interest" persons, as defined Title XXVIII, section 655.005(t).

152.  Claimants, on research, information and belief, thereon allege that Defendants, are Mortgage Lenders, as defined at Title XXXIII.

153.  Claimants, on research, information and belief, thereon allege that Defendants do not have a mortgage lender or broker licenses, required at Title XXXIII, section 494.0067 and 494.000611, therefore, said Title Loan is void (Title XXXIII, section 537.007).

154. Claimants, on research, information and belief, thereon allege that Defendants do not maintain any branch offices (Title XXXIII, section 494.0066) in the state, though required at Title XXXIII, section 494.0067. Wherefore, since Defendants did not have a license for making Title Loans (Title XXXIII, section 537.007), said loan is void.

---

155.  Claimants, on research, information and belief, thereon allege that Defendants are a Mortgage Lender, or a Mortgage Broker, but has not met the requirements under Title XXXIII, section 494.0067, et seq.

156.  Claimants, on research, information and belief, thereon allege that Defendants are conspiring with each other and are the subject of this action, and, said conspiracy has existed from the date of application to the present, with the injuries and damages resulting therefrom being continuing.

157.  Claimants, on research, information and belief, thereon allege that Defendants have received money from a pattern of racketeering activity.

158.  Claimants, on research, information and belief, thereon allege that Defendants have invested that money in enterprises crossing interstate boundaries.

159.  Claimants, on research, information and belief, thereon allege that Defendants are involved in an enterprise affecting interstate commerce by making constructive loans in various States.  See *Bunker Ramo Corp. v United Business Forms, Inc.*, 713 F2d 1272 (1983, CA7 Ill).

160.  Claimants, on research, information and belief, thereon allege that Defendants have caused numerous homeowners injury resulting from the investment of racketeering income distinct from an injury caused by the predicate acts themselves.

161.  Claimants, on research, information and belief, thereon allege that Claimants need not prove economic motive, because the Courts have held that neither 18 U.S.C. §1961's RICO definitions of "pattern of racketeering activity" and "enterprise" or the provisions of §1962(c) require an economic motive.  An enterprise without profit motives is equally capable as a for-profit entity of acquiring or generating money from illegal activity.  For example, abortion protestors can be sued under RICO for alleged extortion by harming businesses like abortion clinics.  See *National Organization for Women, Inc. v. Scheidler*, 510 U.S. 249, 114 S. Ct. 798, 127 L. Ed. 2d 99 (1994).

162.  Claimants, on research, information and belief, thereon allege that Defendants have crossed State lines with their banking activities and enterprises for profit while not disclosing all elements of the loan process to Claimants prior to closing, or at closing.

---

163. Claimants, on research, information and belief, thereon allege that the defendants and the enterprise are separate persons. The enterprise does consist of 3rd party investors and PSA participants' for profit.

164. Claimants, on research, information and belief, thereon allege that the defendants are a party to the Civil Rico complaint, a target as a person involved in the criminal activity other than the enterprise.

165. Claimants, on research, information and belief, thereon allege that the Civil Rico is of a commercial banking nature, and security package sold to the 3rd party who are investors or PSA participants' for profit, that are not the defendants.

166. Claimants, on research, information and belief, thereon allege that the defendant, the original bank, was involved in overcharging consumer loans. See *Morosani v. First Nat'l. Bank*, 581 F. Supp 945 (1984, ND Ga), summary judgment den. 581 F. Supp 955.

167. Claimants, on research, information and belief, thereon allege that the defendants have been involved in receiving ill-gotten gains in this action by overcharging fees, refusing to disclose vital information, refusing to disclose that they will sell or sold or assigned the promissory note over to investors, REMIC or PSA 3rd parties causing "competitive injury" to Claimants.

168. Claimants, on research, information and belief, thereon allege that the constructive conspiracy, the subject of this action has existed from the date of application to the present, with the injuries and damages resulting from the beginning and continuing.

169. Claimants, on research, information and belief, thereon allege that Defendants' actions and use of multiple corporate entities, multiple parties, and concerted predetermined acts and conduct specially designed to constructively defraud the Claimants constitutes an "enterprise," with the aim and objective of the enterprise being to perpetrate a constructive fraud upon the Claimants, through the use of intentional non-disclosure, material misrepresentations, and creation of constructive fraudulent loan documents.

170. Claimants, on research, information and belief, thereon allege that each of the Defendants is an "enterprise Defendant." As a direct and proximate result of the actions of the Defendants, Claimants have and continue to suffer damages.

## COUNT 10:  SET ASIDE NOTICE
## OF TRUSTEE SALE / LIS PENDENS

171.  Claimants reaffirm and re-allege paragraphs above as though set forth fully herein.

172. Claimants, on research, information and belief, thereon allege that Defendants lack  standing to bring about foreclosure proceedings on Claimants home because none of them are the holder in due course of Claimants original promissory note, at the time they commenced foreclosure proceedings.

173. Claimants, on research, information and belief, thereon allege that, as a direct and proximate result of the actions of the Defendants, the Claimants have and continue to suffer damages. (see Exhibit 2, ¶ 6, ¶7, ¶9 ¶10, ¶11)

## COUNT 11: QUIET  TITLE

174.  Claimants reaffirm and re-allege paragraphs above as though set forth fully herein.

175.  Claimants, on research, information and belief, thereon allege that the real estate that is the subject of this action is located at Lot 3, Block 2, of Curva Del Rio, According the the plat thereof recorded in Plat Book 32, page 35, of the Public Records of  Broward county, Florida, more commonly identified as 2208 NW 8th Terrace, Wilton Manors, Florida.

176.  Claimants, on research, information and belief, thereon allege that the title of the Claimants as to which a determination is sought is attached as an exhibit and the basis is that plaintiff contract entitling Claimants and title of the real estate and property. **See Exhibits 1,  2,  3 (Contract); and Exhibit 4 (Title of Real Estate Property).**

177.  Claimants are and at all times herein mentioned was and are the owners of the land and purchased the home (real estate) from name of Kenneth Holt on 12/11/2007 for a sum of $651,500.00 forming a valid and binding contract entitling Claimants to possession and title of the land (property) and the home (real estate). **See Exhibit 4 (Warranty Deed)**

178. Claimants are and at all times mentioned are the owner and/or entitled to possession of the land (property) located at Lot 3, Block 2, of Curva Del Rio, According the the plat thereof recorded in Plat Book 32, page 35, of the Public Records of Broward county, Florida, and the home (real estate) 2208 NW 8th Terrace, Wilton Manors, Florida..

179. Claimants are informed and believe and thereupon allege that Defendants and each of them, claims an interest in the property and real estate adverse to the Claimants herein. However, the claim of said Defendants is without any right whatsoever, and said Defendants have no legal or equitable right, claim, or interest in said property or real estate. (See Exhibit 2, ¶11.)

180. Claimants, on research, information and belief, thereon seek a declaration that the title to the subject property and real estate are vested in Claimants alone, and that the defendants herein, and each of them, be declared to have no estate, right, title, or interest in the subject property or possession of real estate and that said defendants, and each of them, be forever enjoined from asserting any estate, right, title, or interest in the subject property, or real estate adverse to Claimants herein.

181. Claimants are informed and believe and thereupon allege that Defendants filed their foreclosure action after the five year statute of limitations passed, and therefore have waived any claims they may have had.

182. WHEREFORE, Claimants pray for judgment against defendants and each of them as follows:

a) For an order compelling said Defendants, and each of them, to transfer legal and equitable marketable titles and possession of the subject property and real estate to Claimants herein.

b) For a declaration and determination that Claimants are the rightful owner(s) of title to the property and real estate and that Defendants herein, and each of them, be declared to have no estate, right, title or interest in said property or real estate.

c) For a judgment forever enjoining said Defendant, and each of them, from claiming any estate, right, title in said property or real estate.

d) For costs of suit herein incurred.

e) For attorney's fees and/or like attorney fees.

## COUNT 12: WRONGFUL FORECLOSURE

185.  Claimants reaffirm and re-allege paragraphs above herein as though set forth fully herein.

186.  Claimants, on research, information and belief, thereon allege that Defendants, and each of them, failed to comply with serving all notices of default and or trustee sales and such other recordings and actions are void as a matter of law.

187.  Claimants, on research, information and belief, thereon allege that Defendants, and each of them, failed to offer Claimants loan modification or workout plan that would exceed the anticipated recovery through foreclosure on a net present value basis, which means the sale is going to be constructively fraudulent and in fact wrongful foreclosure. See *Perata Bill* SB 1137, a new California Law.

188.  Claimants, on research, information and belief, thereon allege that in the event a sale and deed have taken place, said will be a constructive fraudulent sale and deed must therefore be set aside if the events happen prior to completion of this action.

## COUNT 13: USURY

189.  Claimants reaffirm and re-allege paragraphs above herein as though set forth fully herein.

190.  Claimants, on research, information and belief, thereon allege that the real APR was not disclosed to Claimants.

191.  Claimants, on research, information and belief, thereon allege that the interest charged was greater than state law permits.

192.  Claimants, on research, information and belief, thereon allege that, in regard to usury, a loan to be used primarily for home improvement or home purchase, is not regarded as a loan for personal, family

or household purposes. With these loans and for any other loans which are not for personal, family or household purposes, the allowable rate is higher of 10% or 5% over the amount charged by the Federal Reserve Bank of Atlanta on advances to member banks on the 25th day of the month before the loan (if the agreement to loan and the actual lending of the money are in different months, the 25th day of the month before the earlier event is used).

193.   Claimants, on research, information and belief, thereon allege that the intentionally inflated appraisal lifted the APR far above any disclosed or permissible limits on interest when amortized over the known and likely life of the loan, and no exemptions apply for "financial institutions" or other "licensed" (e.g., pawnbroker lending organizations because the real source of the lain in a table-funded loan was not only lacking a bank charter or lending license, they were most probably not registered to do business in the state) institution.  Title loans made in Florida without a license is void (Title XXXIII, section 537.007).

194. Claimants, on research, information and belief, thereon allege that the pattern of cheating the state out of the revenues from registration and evading the taxes and revenues to the state by not recording the alleged "assignments" of the loans despite state law to the contrary, demonstrates that the constructive fraudulent scheme of tricking borrowers into signing papers they would have signed if they were aware of the true facts so that their identities could be stolen and used to sell unregulated and constructively fraudulent securities, such that the state were victims of the constructive fraud.

## COUNT 14: PREDATORY LENDING

## Florida Fair Lending Act - 494.0078

195.  Claimants reaffirm and re-allege paragraphs above herein as though set forth fully herein.

196.  Claimants, on research, information and belief, thereon allege that assuming *arguendo* that Defendants, and each of them, do have the right under the law of negotiable instruments in this State, by endorsement, assignment, agency or otherwise, to receive payment under a valid note, payment of which was secured by the security instrument, including the power to initiate foreclosure under a power

of sale contained therein, if any, the Defendants, and each of them, is subject to defenses that would have been available against the Initial Lender identified in the security instrument.

197. Claimants, on research, information and belief, thereon allege that the Initial Lender has engaged in predatory lending practices with respect to Claimants, the specifics will be alleged by amendment to this complaint when ascertained. Florida Fair Lending Law, section 494.00791.

198. Claimants, on research, information and belief, thereon allege that one or more of the predatory lending practices referred to in this previous paragraph permits under the law, one or more defenses or remedies, the specifics of which will be alleged by amendment of this complaint when ascertained.

## COUNT 15: UNFAIR DEBT COLLECTION PRACTICES

199. Claimants reaffirm and re-allege paragraphs above herein as though set forth fully herein.

200. Claimants, on research, information and belief, thereon alleges that the Defendants, and each of them, in taking the actions aforementioned, have violated provisions of:

Fair Debt Collection Practices Act, including but not limited to;

    a) Florida Fair Lending Act;

    b) Federal Debt Collection Act, 15 U.S.C. 1692;

    c) Title 15, Subchap. V, §1692 et. seq.;

    d) Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§2601–2617.

201. Claimants, on research, information and belief, thereon allege that one or more of the unfair debt collections practices referred to in the previous paragraph permits, under the law, one or more defenses or remedies, the specifies of which will be alleged by amendment to this complaint when ascertained.

## COUNT 16: SLANDER OF TITLE

202. Claimants reaffirm and re-allege paragraphs above herein as though set forth fully herein.

203.  Claimants, on research, information and belief, thereon alleges that the Defendants and each of them, in taking the actions aforementioned, have made a constructive false and malicious written or spoken public statement disparaging Claimants title to property and real estate that causes harm for which special damages may be awarded slander of title.  See: *M & P Concrete Prods. v. Woods*, 590 So. 2d 429 (1991) [called also defamation of title disparagement of property and real estate disparagement of title.]

205.  Reserved.

206.  Reserved.

207 through 450,  Reserved.

## VIII.  RELIEF  SOUGHT

451.  WHEREFORE, having set forth numerous legally sufficient causes of actions against Defendants, and each of them, Claimants prays that:

a) Defendants, and each of them, and DOES 1-1000 and each of them, be required to deed back to the Claimants the subject real estate and property forthwith;

b) Defendants, and each of them, and DOES 1-1000, be permanently enjoined from any and all further attempts to foreclose on the subject real estate and property, unless and until it can present bonafide proof that it is entitled, under the law of negotiable instruments in force in Florida, to enforce the underlying original promissory note described in the security instrument, if any ever existed, identified in the Deed of Trust (Mortgage) dated December 28, 2007;

c) The Claimants be award monetary damages per highest verdicts against the Defendants, each of them, and DOES 1-1000, and each of them, jointly and severally, that Claimants incurred due to the need to bring this action for injunctive relief according to proof;

d)  That Claimants be awarded statutory damages for Unfair Debt Collection practices and the federal and California statutes;

e) The Claimants be awarded treble damages plus, amount of loan at maturity as permitted by law;

f) That prejudgment interest be awarded Claimants as permitted by law;

g) Entry of a Final Judgment against all Defendants, their heirs, successors, assigns, agents, third party affiliates, jointly and severally in an amount not yet quantified but to be proven at trial and such other amounts to be proven at trial;

h) The Court find that the transactions which is the subject of this action are illegal and are deemed void;

i) That all foreclosure suits and judgments be vacated and sales be enjoined until Defendants prove they have a right and interest that allows foreclosure sale;

j) That the foreclosure that instituted be deemed and declared illegal and void, and the further proceedings in connection with the foreclosure be enjoined;

k) To set aside any illegal trustee sales done during this action.

l) To cancel trustee's deed/lis pendens, if any, is issued prior to or during this action.

n) To quiet title.

o) For compensatory and general damages according to proof;

p) For interest at the prevailing legal rate of interest accrued on any damages awarded to the extent permissible under the law;

q) For exemplary and punitive damages in an amount appropriate to punish Defendants, and each of them and DOES 1-1000, and deter others from engaging in similar misconduct;

r) For the right to accounting;

s) That attorneys fees be awarded as permitted by law;

t) That like attorneys fees be awarded as permitted by law;

u) For costs of suit incurred; and

v)  For corrective actions to restore Claimants credit rating at all agencies and the FICO score to prior to the original Lender (Name of Lender) loan. These corrective actions to be performed by the defendants with confirmation & proof provided to the Claimants forthwith;

w)  For such other and further equitable relief, declaratory relief and legal damages as may be permitted by law and as the court may consider just and proper.

## IX.  DEMAND FOR TRIAL BY JURY

452.  Claimants demand trial by jury of all matters, triable as a matter of right, pursuant 7th Article in Amendment to the United States Constitution 1791.

## X.  FIRST VERIFICATION

453.  I, me jose cartagena, is the claimant and co claimants in the above entitled action. I/we have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge, research, information, except as to those matters which are therein alleged on information and belief, or undisclosed to me, and as to those matters, I believe them to be true.

454.  I, me jose cartagena, declare under penalty of perjury pursuant to 28 U.S.C. §1741(1) and the laws of State of California, that the foregoing true and correct and that this declaration was executed by me in (name of city, county) and State of California.

455.  This _____ 1 2 _____ day of _____ march _____ In the year of Our Lord two thousand and fourteen.

_____
Claimant #1

_____
Witness # 1

_____
Witness # 2.

_____
Witness # 3.

## XI.  NOTARY'S  JURAT:  re jose cartagena.

Florida state

                           ss.

Froward county

Sworn to (or affirmed) and subscribed before me this _____ day of March, 2014, by jose cartagena.

          (NOTARY SEAL)

                          _____

                          Signature of Notary Public - Florida state.

                          Name of Notary Typed, Printed, or Stamped

Personally known _____; OR, produced identification _____.

Type of identification produced: _____.

## XII.  SECOND  VERIFICATION

I, me, scott blattman, am the claimant and co-claimant in the above entitled action. I have read the foregoing complaint and know the contents thereof. The same is true of my own knowledge, except as to those matters which are therein alleged on research, information and belief, and any items undisclosed to me, as to those matters, I believe them to be true.

I, me scott blattman, declare under penalty of perjury pursuant to 28 U.S.C. §1741(1) and the laws of State of Florida, that the foregoing true and correct and that this declaration was executed by me in Broward county and State of Florida.

This ___12___ day of ___March_____In the year of Our Lord two thousand and fourteen.

_____
Name of Plaintiff #2

_____
Witness #1

_____
Witness #2

_____
Witness #3

## XIII. NOTARY'S JURAT: re scott blattman.

Florida state

              ss.

Froward county

Sworn to (or affirmed) and subscribed before me this 22nd day of March, 2014, by scott blattman.

        (NOTARY SEAL)

OSCAR ZELAYA
MY COMMISSION # FF 117427
EXPIRES: April 28, 2018
Bonded Thru Budget Notary Services

_____
Signature of Notary Public - Florida state.


Name of Notary Typed, Printed, or Stamped

Personally Known _____; OR, produced identification ✓_____.

Type of identification produced: _____.

5-22-2014

Reserved.

Etc.,

Etc.,

Etc.

—End.—